UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
In re                                               :
                                                    :
MONITOR SINGLE LIFT I, LTD., et al.                 :        Chapter 11
                                                    :        Case No. 07-13708 (MG)
                                     Debtors.       :
----------------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER DENYING MOTION TO ABSTAIN PURSUANT TO BANKRUPTCY CODE § 305(a)

**A P P E A R A N C E S :**

BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
By:     Steven Wilamowsky
        Jeffrey M. Olinsky
150 Federal Street
Boston, MA  02110
By:     Sabin Willett (*pro hac vice*)
*Counsel for The Ad Hoc Committee of Bondholders*

DORSEY & WHITNEY LLP
250 Park Avenue
New York, NY  10177
By:     Michael Foreman
        Eric Lopez Schnabel
        Steven R. Shoenfeld
        Eric B. Epstein
*Counsel for Debtors and Debtors-in-Possession*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
By:     Lori R. Fife
        Shai Y. Weisman, Esq.
*Counsel for Credit Suisse, as administrative agent to Second Lien Lenders*

BERKMAN, HENOCH, PETERSON & PEDDY, P.C.
100 Garden City Plaza
Garden City, NY  11530
By:     Bruce D. Mael
*Attorneys for Norsk Tillitsmann, ASA, Bond Trustee*

**MARTIN GLENN**
**United States Bankruptcy Judge**

Pending before the court is a motion by the Ad Hoc Committee of Bondholders

("Ad Hoc Committee" or "Bondholders") for the Court to abstain in the chapter 11 case

of Monitor Oil, PLC ("PLC") pursuant to 11 U.S.C. § 305(a)(1). (ECF Doc. # 47.)

Norsk Tillitsmann ASA ("Bond Trustee"), the bond trustee of a $50 million issue of PLC

bonds, filed a joinder supporting the Ad Hoc Committee's motion. (ECF Doc. # 84.)

The motion is opposed by the Debtors (ECF Doc. #'s 78-82) and by Credit Suisse, the

administrative and collateral agent for the Second Lien Lenders. (ECF Doc. # 83.)

On January 7, 2008, the Court announced from the bench that the motion to

abstain was denied with a written opinion to follow. The Court's reasoning in denying

the motion is set forth in this opinion.

## I.  BACKGROUND

On November 21, 2007, Debtors Monitor Single Lift I, Ltd. ("MSL 1"), Monitor

Oil PLC ("PLC"), and Monitor US FinCo, Inc. ("FinCo") (collectively, "Monitor" or

"Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

PLC, the parent company, is currently headquartered in London and its stock is traded on

the Norwegian over-the-counter market. MSL 1 is a Cayman Islands corporation

headquartered in New York, and FinCo is a Delaware corporation with an office in New

York. (Birkebaek 1007 Aff., ¶¶ 7, 12-14.) Both MSL 1 and FinCo are indirect, wholly-

owned subsidiaries of PLC. (*Id.* ¶ 7.)

The Debtors and their non-debtor affiliates are in the business of providing oil and

gas production support services and presently have two principal development projects

focused on oil and gas production in the North Sea.  (ECF # 17, Birkebaek 1007 Aff., ¶

7.)  The first project involves construction of a single-lift vessel ("SLV"), described as

"the world's first dedicated platform and jacket decommissioning vessel which could also

be used to provide offshore accommodation and construction support services."

(Birkebaek 1007 Aff., ¶ 9.)  PLC acquired the rights to the design of the SLV in February

2004.  (*Id.*)  The SLV was the basis for Monitor's bid for a contract to decommission

Conoco Philips' "Ecofisk" North Sea field, and MSL 1 was formed specifically to build

the SLV project.  (*Id.*)  In early 2006, Monitor also began a project to design, build and

operate a power generation buoy ("Power Buoy"), which was designed to drive and

control a series of downhole electrical submersible pumps to increase oil production from

marginal fields.  (*Id.* at ¶ 10.)  Non-debtor Monitor Producer 1, Ltd. ("Producer 1") was

formed for the sole purpose of constructing the Power Buoy, and as part of the

construction project, Producer 1 owes PLC approximately $53.8 million in an inter-

company receivable for financing the Power Buoy project.  (*Id.*)

　　　　Monitor obtained outside financing to support the two projects.  On January 11,

2007, MSL 1, FinCo, and PLC entered into a First Lien Credit Agreement with Credit

Suisse as Administrative Agent and Collateral Agent for the First Lien Lenders.[1]  As of

the petition date, the amounts outstanding under the First Lien Credit Agreement were

approximately $119.1 million in principal, $1.95 million in accrued interest, and certain

fees.  (*Id.* at ¶ 18.)  The obligations under the First Lien Credit Agreement were secured

by the cash collateral, PLC's equity interest in certain subsidiaries and by substantially all

of the assets of MSL 1 and FinCo.  (*Id.*)  Also on January 11, 2007, Monitor borrowed

---

[1]　　　The First Lien Lenders include Black Diamond, Highland Capital, MSD Capital, and Credit
Suisse.  (ECF Doc. # 134, First Day Motion Tr. 12:17-13:1, Nov. 29, 2007.)

under a Second Lien Credit Agreement with the Second Lien Lenders,[2] again with Credit

Suisse acting as Administrative Agent and Collateral Agent.  As of the petition date,

Monitor owed $80 million in principal, $1.45 million in accrued interest, and certain fees

to the Second Lien Lenders, again secured by the cash collateral, PLC's equity interest in

certain subsidiaries and substantially all the assets of MSL 1 and FinCo, and guaranteed

by PLC.  (*Id.* at ¶¶ 19, 20.)  The funds provided by the First Lien Lenders and the Second

Lien Lenders were held in cash collateral accounts at Bank of New York in New York.

(ECF Doc. # 134, First Day Motion Tr. 14:5-13, Nov. 29, 2007.)

As of the petition date, approximately $167.6 million remained in the cash

collateral accounts.  (*Id.* at ¶ 22.)  The Debtors sought Court approval to use the cash

collateral to repay the First Lien Credit Lenders (because their claims were fully secured

and earning interest), which the Court approved on December 6, 2007 after notice and a

hearing.  (ECF Doc. # 64.)  The Debtors now hold approximately $46 million in cash

collateral for the benefit of the Second Lien Lenders.  Pursuant to the terms of the

secured facilities, the Debtors cannot use this money until they raise additional equity to

support its development projects.  (Birkebaek 1007 Aff., at ¶¶ 18, 22, 29.)

On March 16, 2007, PLC also entered into a bond loan agreement with Norsk

Tillitsmann ASA ("Bond Trustee"), acting as trustee on behalf of the bondholders.  (*Id.* ¶

23.)  The bond agreement provides for a series of bonds for a maximum amount of

$50,000,000, to be used in the construction of the Power Buoy.  (*Id.*)  The bond loan was

to be secured by a first priority mortgage on the Power Buoy upon delivery to CNR

---

[2]        The Second Lien Lenders include Credit Suisse, MSD Capital, and Highland Capital.  (ECF Doc.
# 134, First Day Motion Tr. 12:13-16, Nov. 29, 2007.)  The First Lien Lenders and Second Lien Lenders
largely overlap; Black Diamond is the only First Lien Lender that is also not among the group of Second
Lien Lenders.  (Tr. 12:25-13:1.)

International (UK) Limited at its completion.  (*Id.*)  Since the Power Buoy was never completed or delivered, Monitor asserts that the Bond Trustee never obtained a security interest in the Power Buoy.  (*Id.*)

Monitor states that this chapter 11 filing became necessary after experiencing significant setbacks in both of its projects.  During 2007, Monitor was short-listed for a project with Conoco Philips to decommission platforms in the Ecofisk field.  (*Id.* at ¶ 28.) The contract was to be awarded in June 2007.  (*Id.*)  However, the contract award was delayed several times until finally, on October 31, 2007, Monitor was informed that its bid was unsuccessful.  (*Id.*)  The SLV was originally being constructed for use on the Conoco Philips project, and Monitor had already incurred substantial obligations in construction contracts for the SLV before Conoco Philips announced the results of the bidding process.  (*Id.* at ¶ 29.)  The loss of the bid left Monitor without a buyer for the SLV.  As a result, Monitor was unable to raise further financing to finish the SLV project.  (*Id.*)

Monitor also experienced setbacks with the Power Buoy.  During the final stages of construction,[3] disputes arose between Monitor and R&M, the main construction contractor hired by Producer 1 to construct the Power Buoy.  (*Id.* at ¶ 30; ECF Doc. # 134, First Day Motion Tr. 20:24-21:3, Nov. 29, 2007.)  R&M placed liens on the Power Buoy for non-payment, and Monitor disputed the quality of R&M's work on the project. (Birkebaek 1007 Aff., ¶ 30.)  As a result of delays in completing construction, the proposed end user of the Power Buoy terminated its contract with Monitor on October

---

[3]     At the hearing on First Motions, Debtor's counsel represented that the Power Buoy was approximately 85-90% complete when construction was halted.  (ECF Doc. # 134, First Day Motion Tr. 14:23-25, 16:7-12, 20:14-17, Nov. 29, 2007.)

19, 2007.  (*Id.*)  Again, Monitor concluded that constructing the project without a buyer

was not a practical option and sought time to assess its options.

     Finally, in late October 2007, after construction was halted on PLC's two

projects, PLC's former Executive Chairman sued the company in New York Supreme

Court for breach of contract, libel, and slander.  (*Id.* at ¶ 31.)

     By November 21, 2007, the Bond Trustee alleged defaults on the bonds and

purported to accelerate the entire loan, including default interest.  (*Id.* at ¶ 33.)  The

Debtors concluded that a chapter 11 filing was the best means to protect and maximize

the value of the Debtors' assets under the circumstances.  (*Id.* at ¶¶ 32, 33.)

     Due to the geographical scope of Monitor's business operations, the efforts to

protect the parties' interests in the two projects have had international implications.  On

the same date that the Debtors filed their chapter 11 petitions in this Court, the Bond

Trustee filed a petition in the courts of the Cayman Islands seeking appointment of Joint

Provisional Liquidators in the Cayman Islands and England.  The Debtors state (and the

Bond Trustee does not dispute) that the Cayman Islands' petition was never served as

required for the Cayman proceedings to commence.  (*Id.* at ¶ 34.)  On November 22,

2007, or the following day, Producer 1 filed a petition for appointment of an

administrator in Scotland to protect its interests in the Power Buoy project.  The petition

was granted on November 27, 2007.  (*Id.* at ¶ 35.)  The administration proceeding in

Scotland concerning the Power Buoy is ongoing, but the Cayman Islands' proceeding

could not be served (as required for commencement of a Cayman Islands' proceeding)

because of the automatic stay under Bankruptcy Code § 362 upon the filing of the chapter

11 cases.  On December 7, 2007, two additional PLC affiliates, Zenocean Limited and

Monitor Offshore Systems Limited, filed for administration in the United Kingdom.

(Dec. 11, 2007 Birkebaek Aff. ("Birkebaek Abstention Aff."), ECF Doc. # 80 at n.3.)

The Ad Hoc Committee filed the abstention motion on December 3, 2007, soon

after the commencement of this case and only four days after this Court held a hearing on

the Debtor's first day motions.  The motion seeks dismissal or suspension of the PLC

case only, rather than of all three jointly administered cases.  (ECF Doc. # 47.)  Both the

Ad Hoc Committee and Norsk argue that the Court should not passively accept PLC's

choice to file chapter 11 cases in this Court because of PLC's limited connections to the

United States in general, and to New York specifically.  The Bondholders and Norsk state

that PLC is a Cayman Islands corporation, headquartered in London, with its stock traded

over the counter on a Norwegian exchange; that it has no operations in the United States;

and that its business is entirely focused on servicing oil-drilling operations in the North

Sea.  Moreover, one of PLC's key assets, its investment in the Power Buoy project

through Producer 1, is currently the subject of an administration proceeding in Scotland.

The Ad Hoc Committee argues that deference should be granted to the proceeding

already under way in Scotland concerning the Debtors' key asset – the Power Buoy – by

which the Debtors can realize value, as opposed to the SLV project, which, the Ad Hoc

Committee argues, is unlikely to produce any value for the estate.  The Ad Hoc

Committee also argues that professional fees and other bankruptcy expenses will be less

in a U.K. proceeding, benefiting PLC and its creditors; and that the interests of PLC and

all of its creditors would be better served if formal insolvency proceedings were

commenced in the United Kingdom, or in the alternative, in the Cayman Islands, because

of (i) PLC's limited connection to this forum, (ii) the unquestionable fairness of

07-13708-mg    Doc 202    Filed 02/04/08    Entered 02/04/08 09:35:15    Main Document
Pg 8 of 25

administration proceedings in either the United Kingdom (their preferred venue) or the

Cayman Islands (where Norsk initially filed a liquidation proceeding), and (iii) the ability

to maximize the value of estate assets for the benefit of all creditors by limiting the

Debtors' guaranty obligations to the Second Lien Lenders in a U.K. or Cayman

proceeding.[4]

　　　　Both the Debtors and the Second Lien Lenders filed objections to the Ad Hoc

Committee's motion, and both objections raise largely the same issues.  While conceding

that PLC has ties to several different countries, including the U.S., the United Kingdom,

Norway, the Cayman Islands, and China, the Debtors and the Second Lien Lenders argue

that a majority of PLC's creditors are based in the United States; that PLC's primary debt

obligation is governed by New York law; that it maintained headquarters in New York

until recently; that it has U.S. subsidiaries, one of which is involved in these jointly-

administered chapter 11 cases; that it is involved in a lawsuit in New York state court

seeking $5 million in damages; and that it has an office, one employee, and bank

accounts in New York.  In their view, the Ad Hoc Committee seeks to have the Court

abstain from hearing one of the three jointly-administered bankruptcy cases involving the

Monitor Group in favor of an involuntary proceeding either in the U.K. (not yet filed) or

the Cayman Islands (filed but not served), which ultimately will not result in any cost

---

[4]　　　　The unmistakable under-current in this case is the fight between the Second Lien Lenders and the
Bondholders based on their views about the different treatment afforded by U.S. and U.K. bankruptcy laws
to the Second Lien Lenders' $80 million claim against PLC based on PLC's guaranty of the Second Lien
Lenders' loan to a debtor subsidiary, now secured by approximately $46 million in cash collateral.  *See
infra* at 22 n.10.  The Second Lien Lenders argue that under U.S. law, after recovering what ever remains
of the cash collateral, the Second Lien Lenders retain their full $80 million claim against PLC.  Under U.K.
law, however, they argue that the Second Lien Lenders' guaranty claim would first be reduced by any
recovery of cash collateral.  Thus, arguably, the Second Lien Lenders stand to recover a higher percentage
of their claim under U.S. law, reducing the available recovery to the Bondholders.  The Court need not
resolve this issue now.  Unfortunately, the extremely contentious fight between the Second Lien Lenders
and the Bondholders has resulted in virtually every issue in this case being contested, greatly and
unnecessarily increasing the costs of administration.

savings.  Both objectors argue that the Debtors stand to gain greater recovery for the estate and the creditors by filing in this jurisdiction, where their SLV contract rights would be better protected than in proceedings in a commonwealth jurisdiction.  *See infra* at 21-22 (U.S. bankruptcy law permits the debtor to assume executory contracts, while U.K. law does not).  The Debtors and the Second Lien Lenders also argue that Bondholders' assertion regarding cost savings in conducting proceedings in the Cayman Islands or the United Kingdom is unsupported by evidence.  Additionally, both objectors argue that the Bondholders fail to cite a single case where a *voluntary* bankruptcy petition was dismissed in favor of proceedings in an alternate forum, and furthermore that deference to the administration proceeding in Scotland is unwarranted because that proceeding – filed at approximately the same time as these cases – does not involve PLC. Deference to the Cayman Islands is even less warranted, they argue, as the proceeding there has not yet begun because service has not been effectuated on PLC.  Moreover, they argue, whether PLC is placed in administration or liquidation in the United Kingdom or the Cayman Islands, the Bondholders' decision to seek abstention only as to PLC's chapter 11 case means that the administrative costs associated with cross-border insolvency proceedings will still be incurred as this Court conducts proceedings involving MSL 1 and FinCo.  On this record, the Debtors and the Second Lien Lenders argue there is no showing that the Debtors and the creditors as a whole will benefit from abstention.  Therefore, they urge the Court to deny the requested relief.

## II. <u>DISCUSSION</u>

### A.  STANDARDS GOVERNING MOTIONS UNDER SECTION 305(a)(1)

"The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if . . . the interests of creditors and the debtor would be better served by such dismissal or suspension."  11 U.S.C. § 305(a)(1).

"The courts that have construed § 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under § 305(a)(1) only in the situation where the court finds that both 'creditors and the debtor' would be 'better served' by a dismissal."  *In re Eastman*, 188 B.R. 621, 624 (B.A.P. 9th Cir. 1995).  *See also In re Schur Mgmt. Co., Ltd.*, 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005) (dismissing bankruptcy pursuant to § 305(a)(1) as not in the interests of the debtor and creditors because the debtors, as defendants in a pending multi-million dollar suit, prematurely filed for bankruptcy and were able to meet all of their non-contingent liabilities at the time of filing) (citing *Eastman*, 188 B.R. at 625); *In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 255 (S.D.N.Y. 2004) (reversing bankruptcy court's decision dismissing involuntary case against Brazilian holding company under § 105, but remanding matter for bankruptcy court to decide whether abstention under § 305(a)(1) may be appropriate); *In re StatePark Building Group, Ltd.*, 316 B.R. 466, 477 (Bankr. N.D. Tex. 2004) (holding that a predominance of state law issues in the bankruptcy was not a sufficient basis for abstention under § 305(a)(1) because there was no showing that abstention would benefit debtor and its creditors).  Granting an abstention motion pursuant to § 305(a)(1) requires more than a

simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief. *Globo Comunicacoes*, 317 B.R. at 255 (citing *Eastman*, 188 B.R. at 624-25).

The moving party bears the burden to demonstrate that the interests of the debtor and its creditors would benefit from dismissal or suspension of proceedings under § 305(a)(1). *Gurley v. Mills (In re Gurley)*, 222 B.R. 124, 130 (Bankr. W.D. Tenn. 1998) (citing 2 COLLIER ON BANKRUPTCY ¶ 305.02[1] (15th ed. rev. 1997)). The decision to grant or deny a motion for abstention under § 305(a)(1) is reviewed by the district court for abuse of discretion. *Globo Comunicacoes*, 317 B.R. at 257.

## B. THE APPLICABILITY OF SECTION 305(a)(1)

The Debtors and the Second Lien Lenders first argue that a request for § 305(a)(1) dismissal or suspension is inapplicable to the facts of this case, noting that the Bondholders failed to cite any case where an abstention motion was granted over objections by a debtor who filed a voluntary chapter 11 petition, and that courts "almost never" dismiss a voluntary proceeding in this situation.

The legislative history and cases interpreting § 305(a)(1) lend some support to this argument. *See, e.g.*, H.R. REP. NO. 95-595, at 325 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6281 (offering only one example of an appropriate case for abstention, that being an involuntary bankruptcy where there was an out-of-court arrangement being worked out, and certain creditors filed the bankruptcy to exercise leverage in the workout process); *In re Martin-Trigona*, 35 B.R. 596, 598 (Bankr. S.D.N.Y. 1983) (noting that Congress's cited example involving an involuntary bankruptcy petition that threatens a private workout demonstrates its narrow view of the

applicability of § 305, and that "[t]here is no indication that a broader meaning was

intended"); *cf. In re Pine Lake Vill. Apartment Co.*, 16 B.R. 750, 753 (Bankr. S.D.N.Y.

1982) ("It defies credulity to say that the debtor's best interest would be better served by

a dismissal when the debtor voluntarily sought the mechanics of Chapter 11 for the

purpose of rehabilitation and a fresh start"); *see also* 2 COLLIER ON BANKRUPTCY ¶

305.02[2][a] (15th ed. rev. 2007) (noting that the "prototypical fact pattern under section

305(a)(1)" as noted by Congress involves out-of-court workouts and efforts by

recalcitrant creditors to commence an involuntary case to gain leverage). In recognition

of the prevalence of § 305(a)(1) motions involving involuntary bankruptcy cases, the

earliest compilation of factors for courts to consider in a § 305(a)(1) motion considered

only three factors, including whether (1) the petition was filed by a few disgruntled

creditors and the filing was opposed by most other creditors; (2) there was an out-of-court

restructuring in progress; and (3) the debtor's and creditors' interests were furthered by

dismissal. *See, e.g., Globo Comunicacoes*, 317 B.R. at 255 (citing *In re Grigoli,* 151

B.R. 314, 319-20 (Bankr. E.D.N.Y. 1993)); *see also In re Paper I Partners, L.P.*, 283

B.R. 661, 678 (Bankr. S.D.N.Y. 2002) (noting that "early cases" considered these three

factors as relevant in a § 305(a)(1) motion, but that later decisions have broadened the

analysis to include consideration of at least seven factors).

However, nowhere in the text of § 305(a)(1) or in its legislative history did

Congress specifically limit the basis for a § 305(a)(1) motion to involuntary cases

commenced by creditors to gain leverage in out-of-court negotiations. The legislative

history's reference to this fact-pattern only as an "example" of a basis for abstaining

12

under § 305(a)(1) validates this broader view of § 305(a)(1)'s application.[5]  Moreover,

the case law interpreting § 305(a)(1), while dominated by cases concerning involuntary

petitions filed by creditors, is not limited to this situation.  Courts have also abstained

pursuant to § 305(a)(1) based upon the absence of a proper purpose for filing a

bankruptcy, *In re Duratech Indus., Inc.*, 241 B.R. 291, 300 (Bankr. E.D.N.Y. 1999)

(dismissing bankruptcy where the petition was filed to affect the outcome of a two-party

dispute between the debtor and one creditor in state court, and where resolution of the

bankruptcy depended entirely on the outcome of the state court proceeding); where

questions of state law needed to be resolved by the district court before a bankruptcy

could proceed, *In re Milestone Educ. Inst., Inc.*, 167 B.R. 716 (Bankr. D. Mass. 1994)

(suspending proceedings before bankruptcy court pursuant to § 305(a)(1) to allow district

court to first resolve novel issues involving receivership law, as doing so was in the

interest of debtors and all creditors); and where a bankruptcy was filed in response to a

two-party dispute between a debtor and a single creditor.  *In re Spade*, 258 B.R. 221

(Bankr. D. Colo. 2001) (dismissing involuntary chapter 7 petition when creditor

conceded that the bankruptcy petition was used mainly as a strategy to more easily obtain

discovery, after debtor had resisted discovery in a state court action filed by the same

creditor to collect on a guaranty); *see also* 2 COLLIER ON BANKRUPTCY ¶ 305.02[2]

(noting that "[w]hile these courts are correct that fact patterns satisfying the three-part

---

[5]     The relevant portion of H.R. REP. NO. 95-595, appearing at page 325, reads as follows:

   The court may dismiss or suspend under the first paragraph [§ 305(a)(1)], for example, if an
   arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to
   the rights of creditors in that arrangement, and an involuntary case has been commenced by a few
   recalcitrant creditors to provide a basis for future threats to extract full payment.

   Similar language also appears in S. REP. NO. 95-989, at 35-36 (1978), *reprinted in* 1978
U.S.C.C.A.N. 5787, 5821-22.

test [for dismissal of an involuntary proceeding] undoubtedly justify abstention, section

305(a)(1) is not so limited and additional fact patterns may warrant abstention").

Therefore, while reasons for abstaining may be less common in voluntary cases than in

involuntary bankruptcies filed by creditors attempting to gain leverage over the debtor,

this does not foreclose the possibility that a § 305(a)(1) motion will be granted in a

voluntary case.

      The decision to abstain under § 305(a)(1) should be made on a case-by-case basis.

*Matter of Fitzgerald Group*, 38 B.R. 16, 17 (Bankr. S.D.N.Y. 1983) (citing *Int'l House of*

*Pancakes v. Am. Druggist Ins. Co.*, 22 B.R. 926, 928 (Bankr. N.D. Ill. 1982)).

Accordingly, the Court will consider the circumstances of this case in determining

whether there is cause for dismissal or suspension under § 305(a)(1).

### C.  FACTORS CONSIDERED IN A SECTION 305(a)(1) MOTION

      More recent court decisions involving § 305(a)(1) motions apply a seven-factor

test in determining whether to abstain by dismissal or suspension.  These factors build

upon the earlier three-factor test and include: "(1) the economy and efficiency of

administration; (2) whether another forum is available to protect the interests of both

parties or there is already a pending proceeding in state court; (3) whether federal

proceedings are necessary to reach a just and equitable solution; (4) whether there is an

alternative means of achieving an equitable distribution of assets; (5) whether the debtor

and the creditors are able to work out a less expensive out-of-court arrangement which

better serves all interests in the case; (6) whether a non-federal insolvency has proceeded

so far in those proceedings that it would be costly and time consuming to start afresh with

the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has

been sought." *In re Paper I Partners, L.P.*, 283 B.R. at 678 (citing *In re 801 South Wells Street Ltd. Partnership*, 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996)); *In re Trina Assoc.*, 128 B.R. 858, 867 (Bankr. E.D.N.Y. 1991).

While all factors are considered, not all are given equal weight in every case. Where there is a pending foreign insolvency proceeding, concerns of comity must be taken into account and deference must be given to the foreign proceedings. *In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005) ("We have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding . . . . In such cases, deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States."). In this situation, the decision regarding whether the foreign proceeding will fairly and equitably determine the parties' rights is paramount, subsuming questions regarding the economy and efficiency of administration, the necessity of federal proceedings, and any alternative means of equitably distributing assets. Greater importance is given to weighing the benefits and burdens of exercising jurisdiction over the alternate forum. *In re Compania de Alimentos Fargo, S.A.*, 376 B.R. at 434 (granting involuntary debtor's motion to dismiss pursuant to § 305(a)(1) because debtor had limited ties to the United States; had all business operations, customers, and employees in Argentina; and because deference would be given to a procedurally and substantively fair insolvency proceeding pending in Argentina for several years before creditors filed an involuntary chapter 11).

### 1.  Concerns of Comity

In asserting that comity comes into play in this chapter 11 case, the Bondholders rely on the fact that Producer 1, an indirect, non-debtor subsidiary of debtor PLC, is involved in an ongoing administration proceeding in the Court of Session in Edinburgh, Scotland.  As stated by PLC's CEO in two separate affidavits, Producer 1 was formed in 2006 specifically to design, build and operate the Power Buoy, and PLC is owed approximately $54 million from Producer 1 for funds advanced by PLC to construct the Power Buoy.  (Birkebaek 1007 Aff., ¶ 23; Birkebaek Abstention Aff., ¶ 6.)  PLC also holds intellectual property rights and equity interests in the Power Buoy.  (Birkebaek Abstention Aff., ¶ 6.)  While its status as a creditor of Producer 1 in the Producer 1 ongoing administration proceeding is not insignificant, PLC did not put itself into an administration proceeding in Scotland.  As Producer 1 has no involvement in the SLV project, there is also no connection between PLC's efforts to maximize the value of the SLV through this case and the Scottish administration proceeding focused solely on the Power Buoy.

The Bondholders have not cited any authority for the proposition that a foreign insolvency proceeding involving a subsidiary is cause to abstain from a parent company's voluntary chapter 11 case.  All of the cited authorities merely support deference to ongoing foreign insolvency proceedings when courts are asked to adjudicate disputes involving a debtor in the foreign proceeding.  *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418 (affirming district court's dismissal of declaratory judgment action by lending bank against foreign borrower when borrower had filed a Mexican bankruptcy proceeding); *Finanz AG Zurich v. Banco Economico*

*S.A.*, 192 F.3d 240, 246 (2d Cir. 1999) (upholding district court's decision to dismiss action by assignee of promissory notes against defendant, a Brazilian bank, when bank was involved in extrajudicial liquidation in Brazil); *In re Maxwell Commun. Corp.*, 93 F.3d 1036 (2d Cir. 1996) (upholding bankruptcy court's dismissal of adversary proceedings instituted by debtor to avoid preferential transfers when debtor was also involved in a joint, cooperative proceeding in England where the law governing preferential transfers was less favorable to debtor, and English law had primacy over the transfers); *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713-14 (2d Cir. 1987) (upholding district court's decision to defer to the findings of a Swedish bankruptcy court concerning enforceability of a London arbitration award and a British judgment against the debtor in the Swedish bankruptcy proceeding); *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452 (2d Cir. 1985) (upholding vacatur of English corporation's attachment against a defendant who had earlier instituted a Swedish bankruptcy proceeding); *In re Compania de Alimentos Fargo, S.A.*, 376 B.R. at 434 (dismissing involuntary chapter 11 case by request of a debtor involved in ongoing insolvency proceeding in Argentina).  Accordingly, these cases do not bear on the questions currently before the Court.

That the Bondholders have been unable to find authority supporting such a broad deference to foreign insolvency proceedings is not surprising.  In the bankruptcy context, the principles of comity are applied so that the courts may more efficiently and equitably distribute the assets of a debtor in a foreign insolvency proceeding.  *Victrix S.S. Co.*, 825 F.2d at 713-14 ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors

could not be bound, a plan of reorganization would fail."); *Cunard S.S. Co., Ltd.*, 773

F.2d at 457-58 ("The extending of comity to a foreign bankruptcy proceeding, by staying

or enjoining the commencement or continuation of an action against a debtor or its 458

property, has a somewhat different rationale.  The granting of comity to a foreign

bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable,

orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal

fashion.").  The intercompany receivable held by PLC in Producer 1, and PLC's equity

interests in the Power Buoy project are not directly at issue in the Edinburgh

administration proceeding.  To the extent that PLC (and not Producer 1) holds the

intellectual property rights to the Power Buoy, these rights are not property of Producer 1

subject to administration.  The Ad Hoc Committee introduced no evidence demonstrating

how PLC's intellectual property rights in the Power Buoy will be an issue in the Scottish

administration proceeding.  As with any other Producer 1 creditor, PLC will only be

involved in the administration proceeding to the extent it seeks to enforce its own claims

stemming from its contract rights as a creditor of Producer 1.  Due to the lack of a

pending foreign insolvency proceeding involving PLC as a debtor, the broader principles

of comity in the bankruptcy context do not require this Court to give further consideration

to the ongoing administration proceedings.[6]  Accordingly, the existence of Producer 1's

Scottish administration proceeding will only be taken into account in analyzing the seven

---

[6]      Perhaps most telling of all, the Ad Hoc Committee seeks to have this Court abstain, not in favor of
the Producer 1 administration proceeding in Scotland or of the PLC liquidation proceeding that the Bond
Trustee attempted to commence in the Cayman Islands, but rather in favor of an as-yet unfiled proceeding
in England.  The Ad Hoc Committee cites no authority supporting abstention where no relevant foreign
proceeding concerning the debtor was already pending.

factors considered in ruling on a § 305(a)(1) motion.  The Court will consider each of these seven factors in turn.

### 2.  The Seven Factors

> #### a.  Factors 1, 2, and 3:  Economy and Efficiency of Administration, the Availability of an Alternative Forum, and Necessity of Conducting Proceedings Under U.S. Law

The Bondholders argue that the "lion's share" of the value in the Monitor Group lies in the Power Buoy project, and that it makes no sense to move forward with this chapter 11 case while an administration proceeding continues in Scotland due to the "additional layer of administrative expense" that will be created as a result.  While the SLV project is best characterized as "untested,"[7] and there may or may not be any value in PLC's intellectual property rights to the SLV when any distribution to creditors is made, both the Debtors and the Second Lien Lenders have emphasized the potential value in PLC's shipbuilding contracts for the SLV with the Siemens consortium and Global Maritime.  (Birkebaek Abstention Aff., ¶ 21.)  To date, the value of these contract rights and of the SLV has not been quantified.  The Court cannot conclude that the Power Buoy project makes up most of the value of the Monitor Group; nor would that conclusion be determinative in any event.  What is clear is that Monitor's Board concluded that filing for chapter 11 protection in the United States was in PLC's best interests due to the potential value of the SLV.  (Birkebaek Abstention Aff., ¶ 21)  Mr. Birkebaek's testimony at the December 18, 2007 hearing on the abstention motion was consistent with statements he made in his affidavit in opposition to the Bondholders' motion, further explaining that the chapter 11 process allowed the Debtors to keep current management

---

[7]        The Court used these words at the hearing on first day motions, after Debtor's counsel explained that the SLV project is the only project of its kind and "state of the art."  (First Day Motion Tr. 25:14-20, Nov. 29, 2007.)

and key employees in place to assist with the reorganization, and to preserve the value of

the SLV project for the benefit of creditors.  (Abstention Tr., Abstention Hearing Tr.,

107:10-108:11, 108:21-111:25.)

Even though PLC, MSL 1 and FinCo are all in bankruptcy proceedings before this

Court, the Bondholders' motion seeks only to have the Court abstain with respect to the

PLC case.  The Debtors and the Second Lien Lenders argue that this result would leave

two of the three debtors in bankruptcy proceedings in this Court while moving the PLC

proceeding to the United Kingdom or the Cayman Islands.  At least some expense would

be incurred while court-appointed administrators or liquidators in either alternative forum

became familiar with PLC's affairs.[8]

There is little evidence to support the Bondholders' argument that joint

administration proceedings involving PLC and Producer 1 would be more economical.

The Ad Hoc Committee submitted a declaration asserting that U.S. proceedings are more

expensive because of a larger number of court hearings and expenses for a creditor's

committee that would be unavailable in the U.K. (*See, e.g.,* Bondholders' Exh. 2, Moss

Decl., ¶ 17.)  The declaration does not support the Bondholders' statement that this

bankruptcy is "almost certain" to cost more than an administration in either the U.K. or

the Cayman Islands.  The Debtors countered with evidence that the billing rates of

London lawyers are similar to rates in New York (Debtor's Exh. C, Chadwick Decl., ¶

18), and even when adding costs for a creditor's committee and other estate-compensated

---

[8]      While there must be some cost associated with an administrator's efforts to become familiar with
PLC and its business, the Court places little weight on this factor.  As noted above, the Ad Hoc Committee
filed this motion on December 3, 2007, four days after this Court's hearing on first day motions, and the
motion was heard on the next omnibus motion day.  The motion was made and heard as soon as was
reasonably practicable in recognition of this Court's desire to have full briefing on the motion.  (First Day
Motion Tr. 112:16-18, Nov. 29, 2007.)  Were the Court to give significant weight to the need for an
administrator to get "up to speed," this factor would always weigh against abstention.

professionals in a chapter 11 case, it is not clear that these costs outweigh the benefits of

conducting this bankruptcy case under U.S. law.  The Debtors' experts' declarations

show that it is not a foregone conclusion that joint administration of a PLC proceeding in

London with the Producer 1 proceeding in Scotland is possible, or that expenses would

be saved if Ernst & Young, the interim managers in the Scottish administration

proceeding, were able also to act as interim managers for PLC in a Cayman Islands

proceeding.  (Debtor's Exh. B, Timms Decl., ¶ 12; Debtor's Exh. C, Chadwick Decl., ¶¶

23-24.)[9]  Assuming that PLC's assets were administered in the Cayman Islands, as

opposed to Scotland, there would be proceedings involving the Monitor Group before

this Court (FinCo and MSL 1, who are not the subject of this abstention motion), before

an administrator in Scotland (Producer 1), and in the Cayman Islands (PLC).  There is no

showing that any efficiency or economy would result, and logic would dictate that

expenses would be higher were PLC's assets to be administered in the Cayman Islands.

Moreover, the Bondholders' arguments with regard to efficiency and economy

ignore the basis for PLC's decision to file the chapter 11 cases in this Court and its effect

on the potential recoveries by all creditors.  The Debtors have stated that their decision to

file the chapter 11 cases was based on their sound business judgment, after taking into

---

[9]    Mr. Chadwick explains that because PLC has little or no assets of value within the jurisdiction of
English courts there would be little purpose served in liquidating PLC within the U.K.  This disputes the
conclusion reached by Ms. Toube, who offers a declaration in support of the Bondholders' motion, stating
that she believes PLC either has its center of main interest in England or a significant connection to
England making it "very likely" that insolvency proceedings would be opened in the U.K.  (Bondholders'
Exh. 5, Toube Decl., ¶ 10.)  In his declaration, Mr. Tims explains that Ernst & Young's Cayman practice
no longer includes an insolvency or restructuring group, and that the general practice of the Grand Court in
the Cayman Islands is to require at least one of the liquidators to be a local appointee.  The Bondholders'
expert on Cayman law generally agrees with Mr. Tims regarding the practice of the Grand Court
(Bondholder's Exh. 3, McDonough Decl., ¶ 10), further stating that there is a proposal that one
representative from another firm with a Cayman restructuring practice, Deloitte & Touche, would be
appointed as one of the Provisional Liquidators to satisfy this custom.  McDonough's declaration therefore
accepts that an appointment of Ernst & Young as a Provisional Liquidator would in reality require
involvement by two separate firms.

account the effects of Bankruptcy Code § 365, invalidating *ipso facto* clauses and

permitting a debtor to assume executory contracts, thereby allowing the Debtors to

preserve the value of the SLV project.  The Ad Hoc Committee's counsel acknowledged

in argument that similar protections are not available in the Cayman Islands or the U.K.

A party may validly seek to file a bankruptcy case in an otherwise proper jurisdiction

because of distinct legal protections in bankruptcy and their consequences for

maximizing estate assets.  *See, e.g.*, *In re RCM Global Long Term Capital Appreciation*

*Fund, Ltd.*, 200 B.R. 514, 525 (Bankr. S.D.N.Y. 1996) (refusing to abstain in favor of

state court action because bankruptcy was filed partially to avoid a transaction as a

fraudulent transfer, relief unavailable before the state court).  To the extent that there are

increased administrative expenses from proceeding under chapter 11, rather than

administration in the U.K. or liquidation in the Cayman Islands, these costs may be more

than offset by the value of PLC's preserved rights in the SLV project.  Regardless, there

is no showing by the Bondholders on the record before this Court that the potential

benefits under U.S. bankruptcy law are outweighed by the potential costs of the chapter

11 cases.[10]  Factors 1 and 3 therefore weigh against abstention, and to the extent that an

administration in the Cayman Islands or the United Kingdom would result in the loss of

---

[10]    The Bondholders submitted a declaration by Rosalind Toube, an English barrister, which
discusses at length the effect English law may have on the Second Lien Lenders' ability to submit a net
($33.5 million) or a gross ($80 million) claim against PLC after the value of the Second Lien Lenders' cash
collateral is taken into account.  (Bondholders' Exh. 5, ¶¶ 11-17.)  Ms. Toube's conclusions are disputed by
Mr. Chadwick's declaration supporting Debtor's objection to the extent that an English court found these
cash collateral funds were funds of a third party, rather than the Debtor's funds.  (Debtor's Exh. C, ¶¶ 14-
17.)  The Bondholders did not offer further evidence regarding how the cash collateral funds are likely to
be characterized in a U.K. administration proceeding.  Neither Ms. Toube nor Mr. Chadwick was present
for examination at the December 18, 2007 hearing.  Therefore, the Court is left with competing declarations
and finds that the Bondholders have not established that English treatment of the Second Lien Lender's
guaranty claim clearly shows that the Debtors and the creditors as a whole would benefit from conducting
an administration or liquidation in the U.K.  The Bondholders did not submit a declaration explaining how
PLC's guaranty would be treated in a Cayman proceeding.

valuable contract rights held by PLC, there is also no adequate alternative forum for

proceeding with PLC's reorganization or liquidation for purposes of factor 2.

     *b.  Factors 4, and 5:  Alternative Means to Achieve an Equitable
         Result, and the Possibility of an Out-of-Court Arrangement*

     The Bondholders argue that both the United Kingdom and the Cayman Islands

have legal systems that help PLC maximize value and equitably distribute estate assets

among its creditors.  Neither the Debtors nor the Second Lien Lenders dispute this basic

assertion.  However, both objecting parties reiterate that a distribution to creditors in a

proceeding in the Cayman Islands or the United Kingdom would be a distribution of

fewer assets by virtue of PLC's loss of contractual rights in the SLV project.  The court

concludes that both the United Kingdom and the Cayman Islands would allow for an

equitable distribution of estate assets, although as discussed with respect to factor 3,

proceedings under U.S. law appear more attractive due to the protections of Bankruptcy

Code § 365.

     In a rare showing of agreement, all parties agree that no out-of-court workout is

possible.  Therefore, factor 5 need not be discussed as it does not weigh in favor of

granting the abstention motion.

     *c.  Factor 6:  The Status of Non-Federal Insolvency Proceedings*

     The Debtors commenced their jointly-administered chapter 11 cases on

November 21, 2007.  By the Bondholders' own admission, an involuntary winding-up

petition concerning PLC was filed in the Cayman Islands onlyhours before PLC filed this

bankruptcy.  However, PLC was not served with the Cayman petition before this chapter

11 was filed, and the Bondholders have not taken any further action with respect to the

Cayman proceeding, which became subject to the automatic stay upon the filing of this

chapter 11 case by PLC.  The Bondholders' motion and supporting evidence also indicates that Producer 1's Scottish administration proceeding was filed at or around the time when both the Cayman petition and these chapter 11 cases were filed such that none of the three proceedings have made any substantial progress.  (Bondholders' Exh. 3, McDonough Decl., ¶ 9.)  While Bondholders argue that the lack of progress in any of the three insolvency proceedings "does not militate against abstention," courts considering this factor generally find that a longstanding proceeding pending in another jurisdiction would be a factor weighing in favor of abstention.  *See, e.g.*, *In re Compania de Alimentos Fargo, S.A.*, 376 B.R. at 434 (abstaining from hearing involuntary chapter 11 case when debtor was involved in administration in Argentina that had been ongoing for several years).  Accordingly, the lack of progress in either the Cayman Islands or in Producer 1's Scottish administration weighs against abstention or dismissal.

### d.  *Factor 7:  Purpose For Which This Bankruptcy Was Filed*

The Bondholders' moving papers explain that due to a lack of discovery prior to filing the motion, they did not dispute that PLC filed its chapter 11 case for a proper purpose.  Counsel for the Bondholders took further discovery between December 3, 2007, when the motion was filed, and the hearing on this motion on December 18, 2007.  Counsel for the Bondholders also questioned Mr. Birkebaek during the December 18 hearing, but no further argument was made, and no evidence introduced, that would tend to show that this chapter 11 case was filed for an improper purpose.  In support of their objection, the Debtor's counsel offered an affidavit by Mr. Birkebaek attesting to the beneficial aspects of a chapter 11 filing, including preservation of valuable contract rights, and the statements in the affidavit were further supported by Mr. Birkebaek's in-

court testimony.  Therefore, this factor also does not weigh in favor of granting the abstention motion.

### III. CONCLUSION

After due consideration of all seven factors, the Court concludes that the Bondholders failed to demonstrate a basis for granting the extraordinary relief sought under § 305(a)(1).  While there are ongoing proceedings involving at least one PLC subsidiary in Scotland, the Scottish proceeding does not directly affect the administration of PLC's estate before this Court,[11] and the Debtors have offered sound arguments why this chapter 11 case better protect PLC's contractual rights, and therefore the rights of PLC's creditors as a whole, than could proceedings in either the Cayman Islands or the United Kingdom.  Accordingly, Bondholders' motion pursuant to § 305(a)(1) is **DENIED**.

**IT IS SO ORDERED.**

DATED:          February 4, 2008
                    New York, New York


                                                          **/s/Martin Glenn**
                                                          MARTIN GLENN
                                                          United States Bankruptcy Judge

---

[11]        The fact that proceedings are pending in several countries does not mean that the courts in these proceedings cannot cooperate to further the efficient administration of these cases.  Such cooperation is indeed common and would be welcomed by this Court.